1  **WO**                                                                 NN

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8

9   James Beloit,                        )   No. CV 06-2009-PHX-EHC
                                          )
10          Plaintiff,                    )   **ORDER**
                                          )
11  vs.                                   )
                                          )
12                                        )
    Michael J. Astrue, Commissioner of Social )
13  Security,                             )
                                          )
14          Defendant.                    )
                                          )
15  ─────────────────────────────────────

16      This is an appeal from the decision of the Commissioner of the Social Security

17  Administration[1] ("SSA" ) to deny James Beloit disability benefits under Title II and

18  Supplemental Security Income under Title XVI of the Social Security Act. (Tr. 17).

19  **I. INTRODUCTION**

20      The Administrative Law Judge ("ALJ" ) denied Beloit's claim for disability benefits on

21  June 5, 2006, and the Appeals Council denied review. (Dkts. 1, 10).  Pending before the

22  Court are the parties' Cross-Motions for Summary Judgment. (Dkts. 13, 17).

23  **II. STANDARD OF REVIEW**

24      "The Social Security Administration's disability determination should be upheld unless

25  it contains legal error or is not supported by substantial evidence." Orn v. Astrue, 495 F.3d

26

27  ────────────────────

28      [1] Michael J. Astrue is now the proper defendant and replaces his predecessor, Jo Anne
    B. Barnhart, pursuant to Fed. R. Civ. P. 25(d)(1).

625, 630 (9th Cir. 2007) (citing <u>Stout v. Comm'r, Soc. Sec. Admin.</u>, 454 F.3d 1050, 1052 (9th Cir.2006); 42 U.S.C. §§ 405(g), 1383(c)(3)).  "Substantial evidence is more than a mere scintilla but less that a preponderance." <u>Bayliss v. Barnhart</u>, 427 F.3d 1211, 1214 n. 1 (9th Cir. 2005) (internal quotation marks and citation omitted).  "[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." <u>Orn</u> at 630. (internal quotation marks and citations omitted).

## III.  FACTS

### A.  <u>Education and Employment Background</u>

Plaintiff, 45, was born on February 8, 1963. (Tr. 24).  He has inconsistently reported receiving and not receiving special education services and a General Equivalency Diploma ("GED") (Tr. 175, 331, 350, 523).  He started working at 13 "digging ditches," and has worked in the construction industry most of his adult life. (Tr. 394).  He completed truck driving school in 1992 or 1994. (Tr. 160, 175).  He had applied for entrance into the military but "failed the smart test." (Tr. 393).  His relevant employment history includes work as a journeyman electrician (1996-2003) (Tr. 172), truck driver, and pipe layer. (Tr. 160-64).

### B.  <u>Physical Condition/Medical Treatment</u>

#### 1.  Preliminary rulings

The SSA's denial on April 12, 2004 and reconsideration on February 25, 2005 found Plaintiff's physical limitations precluded his return to previous work, but  "should not keep [him] from doing other work which is less demanding." (Tr. 32-33, 37-38).

#### 2.  Prior medical history

In 1994, nine years prior to the injury which prompted the current disability claim, Beloit had "a cervical diskectomy and fusion at C5-6" after being struck in the back of the head while on the job as a truck driver.  The injury resulted in a 7% permanent, functional impairment. (Tr. 80, 84).  He did not work for two years, and Worker's Compensation benefits ended in 1996. (Tr. 96).  It was assessed he could not do "overhead work," and

should avoid work in the construction trades. (Tr. 80).  He never returned to truck driving. (Tr. 394-95).

Plaintiff eventually returned to work, and in 2001 suffered another industrial injury to his left knee which required arthroscopic surgery. (Tr. 57, 403).  He reports he was out of work approximately one year. (Tr. 395).  Although not noted by the parties and the ALJ, Worker's Compensation documentation indicates the knee injury resulted in a 5% permanent impairment, (Tr. 77, 79), and medical records show that Plaintiff has a history of multiple wrist and finger fractures. (Tr. 399).

**3.  Current injury**

On June 10, 2003, Plaintiff suffered his third work-related injury which caused neck, shoulder, and back impairments, and gave rise to his current claim of entitlement to disability benefits. (Tr. 56-57).  Beloit has consistently described the events at work leading up to the injury:  he felt his neck pop while repeatedly lifting light fixtures, immediately felt a sharp pain, and then fell to the ground.  Cervical spine x-rays taken the same day did not show signs of acute fracture (Tr. 58) but confirmed his prior fusion surgery at C5-6. (Tr. 236).

**4.  Treating physicians**

*a)      Dr. Darrin Scherer*

Plaintiff was first seen by his treating physician, Dr. Darrin Scherer, on June 16, 2003. Plaintiff reported the following symptoms:  when turning his head, he experienced a "split second black-out" and then saw spots; he felt "tingly sensations" from his neck to his ankles; and had been bedridden since the accident. (Tr. 312).  Dr. Scherer ordered lumbar spine x-rays which revealed minor degenerative changes, (Tr. 58), and placed Beloit on "off duty" status at least until June 23, 2003, when he would re-evaluate Plaintiff's condition. (Tr. 313).

An MRI performed on June 27, 2003, revealed disc desiccations; osteophyte ridgings; degenerative changes, a 2 mm posterior subluxation; a disc protrusion; a disc bulge; left neural foraminal narrowing;" and an obliteration of disc space at C5-C6 (as a result of his prior fusion surgery). (Tr. 58, 268-69).

1    A second MRI, performed on July 21, 2003, was ordered to clarify a potential
2    abnormality. (Tr. 328).  Dr. J. Michael Powers compared the two MRI scans and found that
3    "[m]ultilevel degenerative changes were seen with no acute abnormality that would relate
4    to his more recent symptoms." (Tr. 322).

5    During Beloit's taxicab ride home after undergoing the second MRI, the cabdriver got into
6    an accident, went over a curb, and wound up in an apartment complex. (Tr. 56).  Plaintiff
7    received emergency medical treatment the same day. (Tr. 283).  The x-rays were negative,
8    although he complained of exacerbated pain in his neck and back.  He was diagnosed with
9    cervical lumbar strain, given a soft cervical collar, and prescribed Vioxx, Percocet, and
10   Soma. (Tr. 283).  When Plaintiff later described the accident to Dr. Powers in 2004, he said
11   his head hit the roof of the cab, his teeth shattered, and he blacked out. (Tr. 326).  However,
12   the emergency department report noted that "[h]e did not hit his head" and there was no
13   mention of shattered teeth or black-outs. (Tr. 282).

14   On September 22, 2003, Dr. Scherer noted Beloit's ongoing neck pain; increased
15   numbness/tingling throughout both arms; decreased strength in his hands with resulting
16   inability to hold cups or cans; confusion; lethargy; and increased blood pressure. (Tr. 311,
17   314).  In October and November of 2003, Dr. Scherer assessed chronic neck pain and
18   C-spine radiculopathy. (Tr. 315-16).  He increased Plaintiff's Vicodin dosage due to
19   increasing pain, and referred him for a chronic pain evaluation. (Tr. 309, 316).  Dr. Scherer
20   reported Plaintiff's condition was "decompensated" and was not able "to fully resume type
21   of work performed at time of injury," but did not know if a permanent functional impairment
22   had resulted from the industrial injury. (Tr. 319).

23   **b)**    ***Dr. C.W. Bryant***

24   On August 13, 2004, Plaintiff was examined by a new treating physician, C.W. Bryant,
25   M.D., for the first time.   Dr. Bryant's notes are difficult to decipher; Defendant's
26   interpretation was that most "system" examination results were within normal limits but there
27   was "neck tenderness" and "reduced range of motion due to pain." (Dkt. 18, p. 4; see Tr.
28   489).  The doctor indicated Beloit had a physical or mental incapacity that prevented him

from performing any substantially gainful employment, but the impairment was not expected to result in death, nor that it had lasted or was expected to last for a period of not less than twelve months. (Tr. 417).

On September 14, 2004, one month after he began treating Plaintiff, Dr. Bryant opined that Beloit's physical abilities were substantially restricted. Notably, the doctor based these findings on the "patient's word." (Tr. 419-20). The record reflects monthly visits to Dr. Bryant from August 13, 2004 to April 26, 2006, but a more recent disability evaluation is not in the record. Throughout this period of treatment, Plaintiff consistently complained of severe pain all over. The doctor diagnosed Plaintiff's major problems as degenerative disc disease, anxiety, depression, and impotency. (Tr. 463). Treatment notes reflecting more than routine pain medication refills are summarized:

**09/14/2004** - Can't see well and is depressed. (Tr. 488).
**09/30/2004** - Neck brace stolen. (Tr. 487).
**10/12/2004** - His 'teeth are rotting out"and "[r]emains severely depressed." His phone was turned off and he is being evicted from his apartment. (Tr. 486).
**11/11/2004 -** Severe neck, bilateral knee pain, has new left knee brace and will be getting new right knee brace. (Tr. 485).
**12/06/2004** - Increased neck pain and continued back pain. Doctor observed he was "[v]ery confused about his situation and all of his medications." (Tr. 484).
**01/05/2005** - Prescribed Viagra[2]; increased neck pain, continued back pain. (Tr. 483).
**03/22/2005** - Doctor filled out Federal Student Aid form for Plaintiff. (Tr. 481).
**08/31/2005** - Referred for sight conservation consult. (Tr. 475).
**10/12/2004** - Referred for Value Options consult. (Tr. 486).
**11/29/2005** - Glasses make eyes burn; sore throat, earache; two new drugs. (Tr. 472).
**01/26/2006** - Teeth causing problems; trouble eating. (Tr. 470).
**03/02/2006** - Worse neck pain; not eating well because he lost his food stamps. (Tr. 469).

**5. Examining, non-treating physicians**

*a)* ***Dr. Christopher Yeung***

On August 4, 2003, Plaintiff was seen by Dr. Christopher Yeung, an orthopedic surgeon, who noted Plaintiff was not on any medication, drank "about a 12 pack every three days," "smell[ed] of alcohol" during the consultation, and was not in any acute distress. (Tr. 292-94). Dr. Yeung observed that Plaintiff's responses were "over exaggerated."and that his

---

[2] Viagra was prescribed to Beloit six times from January 5, 2005 to August 31, 2005. Beloit filled out a low back pain questionnaire in April of 2004 in which he indicated his pain "prevents any sex life at all." (Tr. 374).

1  pain response was out of proportion to the MRI findings. (Tr. 293-94).   Dr. Yeung
2  recommended pain management, concluding that Plaintiff had "severe pain, which precludes
3  him from returning to work at this time." (Tr. 294).

4    **b)    Dr. Gerald C. Moczynski**

5    On September 9, 2003, Dr. Gerald C. Moczynski, another orthopedic surgeon, listed the
6  Plaintiff's symptoms of constant  neck, shoulder and back pain; numbness in his arms and
7  legs; limited neck and shoulder motion; headaches and dizziness when walking and lying
8  down. (Tr. 57, 296).  The doctor observed that Beloit's "range of motion of his cervical spine
9  is limited in deflection so that his chin comes within 3 finger breadths of his chest, and that
10 his "lateral flexion and rotation are limited to 20% of normal motion."   The doctor
11 recommended continued active treatment, noting his condition was not stationary. (Tr. 59,
12 298).

13   **c)    Dr. Paul LaPrade**

14   On November 13, 2003, Beloit was evaluated by another neurosurgeon, Dr. Paul LaPrade,
15 who noted Plaintiff's complaints of constant severe pain, such that he "feels as if he is going
16 blind in his eyes"; difficulty holding on to anything; frequent falls, intermittent dizziness; and
17 severe migraines. (Tr. 320-21).  Plaintiff explained to the doctor that a few days earlier he
18 fell, hitting his right hand on the toilet; the doctor observed his hand was wrapped in an ace
19 bandage. (Tr. 320).  Beloit also reported he was a light drinker. (Tr. 320).

20   Dr. LaPrade observed that Plaintiff: appeared to be in distress; could not feel a pinprick
21 in his upper extremities; had only trace reflexes and decreased range of motion in his neck;
22 felt his eyes were going blind "because of pain"; would not attempt to bend forward to assess
23 back range of motion; and had a slow gait. (Tr. 320).   The doctor found that Beloit
24 "appear[ed] to be fairly disabled from neck pain, back pain, left shoulder pain," "could not
25 lift either arm over his head or even close to that," and "had numbness and tingling in all four
26 extremities." (Tr. 321).  Dr. LaPrade added that "[n]one of this is terribly consistent with his
27 radiographic abnormality in the neck." (Tr. 321).

28

*d)* **Dr. J. Michael Powers**

On February 13, 2004, Plaintiff was seen by a neurologist, J. Michael Powers, M.D. Beloit brought a three-page list of his symptoms, including various severe, pervasive symptoms of pain, spasms, numbness, dizziness, vision problems, nausea and forgetfulness, (Tr. 326-27). After the examination Dr. Powers told Plaintiff to get dressed and go to his office, but after several minutes, he checked on Plaintiff, who was still undressed in th exam room; Plaintiff said he forgot what the doctor had told him to do. (Tr. 328).

Dr. Powers noted that Plaintiff showed signs of significant functional overlay [3] (Tr. 322). He recommended treatment for depression, observing "he is [in] a self perpetuating situation where his symptoms are progressively worsening associated with his inactivity and escalating depression." (Tr. 329-30).

The doctor did not find any "evidence that [Plaintiff] sustained any primary injuries as the result of the June 10, 2003 industrial injury," and believed "that his condition [was] stationary in that regard." (Tr. 329) However, Dr. Powers recommended another MRI to rule out "any additional disk herniation or other soft tissue injury that may have resulted from the July 21 motor vehicle accident," especially in light of Beloit's worsening symptoms. (Tr. 329, 322). On March 2, 2004, a third MRI of the cervical spine showed "some interval change in the structure of the spine" above the previous fusion," but any symptoms would not be expected "to produce diffuse pain symptoms throughout the neck, trunk and all limbs." (Tr. 323).

*e)* **Dr. Ali Araghi**

Plaintiff was referred to Dr. Araghi on April 2, 2004 at the request of Plaintiff's attorney, to see whether he would accept Plaintiff as a patient. (Tr. 363, 491). Plaintiff filled out extensive back and neck pain questionnaires. His answers are summarized:
• His pain is very severe and needs help every day in most aspects of self care.
• Pain prevents him from walking more than 100 yards and sitting more than thirty minutes.

---

[3] "[A] disorder with no known or detectable organic basis to explain the symptoms." (Dkt. 19, p. 4, note 3).

- Pain prevents his standing more than ten minutes and lifting more than very light weights.
- Because of pain, he sleeps less than four hours and pain prevents any sex life at all.
- Pain prevents him from traveling except to receive treatment.
- He cannot read as much as he would like due to severe neck pain.
- He has headaches almost all the time, and has a great deal of difficulty with concentration.
- He cannot do any work or drive his car at all.
- He cannot do any recreational activities at all and has no social life because of pain.

(Tr. 374-75).

Beloit reported occasional urinary incontinence and constipation, and stated he did not drink alcohol. (Tr. 364, 492). Dr. Araghi wrote: "Sitting, standing, walking, lying down, and rising from a chair are all worse for him." (Tr. 363, 491). He diagnosed mild spondylosis, "left neural foraminal narrowing of C4-C5," and functional overlay. (Tr. 365, 493). He concluded there was no basis for Beloit's pain referable to the cervical spine  and thus no need for surgery. (Tr. 365, 493).

### f)       Dr. Lucia McPhee

On November 8, 2004, Dr. Lucia McPhee, a specialist in Physical Medicine and Rehabilitation, evaluated Plaintiff at the request of the Arizona Department of Economic Security ("DES"). (Tr. 422-34).  Because Beloit complained of pain in both knees, x-rays were taken, which were "unremarkable." (Tr. 424).  Dr. McPhee opined that Plaintiff's physical limitations allowed for medium exertional-level work ("medium work").[4] (Tr. 425-26).

### 6. Non-examining, non-treating physicians

### a)       RFC[5] - Medical consultants' names illegible

An RFC dated April 2, 2004 cites a primary diagnosis of "[c]ervical pain status post cervical diskectomy and fusion at C5-6 with strong psychosomatic overlay," and a secondary diagnosis of "[p]robable narcotics addiction." (Tr. 352).  Physical limitations were more

---

[4] Lift/carry 50 pounds occasionally and 25 pounds frequently; stand/walk 6 hours in 8-hour workday; sit 6 hours in 8-hour day; Climb/stoop/crawl occasionally; balance kneel/crouch frequently. (Tr. 425-26).

[5] Residual Functional Capacity ("RFC") is the most an individual can still do after considering the effects of physical and/or mental limitations that affect the ability to perform work-related tasks. 20 CFR 404.1545, 416.945 and Social Security Ruling 96-8p.

1    restricted than medium work.[6] (Tr. 353-56).    A second RFC dated December 14, 2005

2    reflects limitations consistent with medium work. (Tr. 429-31).    Both medical consultants

3    opined that although Plaintiff's symptoms were attributable to medically determinable

4    impairments, their severity and duration were disproportionate to the expected severity and

5    duration on the basis of those impairments. (Tr. 357, 433).

6        *b)*    ***Testimony of Medical Expert - Dr. Vincent P. Russo***

7        Dr. Vincent P. Russo, an SSA-appointed orthopedic surgeon and non-examining

8    physician, reviewed the numerous medical tests, noting that the June 2003 MRI had

9    displayed degenerative changes, and a subsequent MRI showed even more disk degeneration

10    and more pronounced flattening of the spinal cord. (Tr. 529).    He observed that "there was

11    some evidence [of] exaggerations, if not malingering." (Tr. 530).    He opined that Beloit has

12    "a considerable disability." (Tr. 530).

13        Dr. Russo testified Plaintiff's limitations primarily involved neck movement. (Tr. 530).

14    On cross-examination, Dr. Russo affirmed Dr. Yeung's opinion that Plaintiff's severe pain

15    precluded work; Dr. LaPrade's account that Beloit was "fairly disabled" due to pain; and Dr.

16    Powers' determination that Plaintiff's condition was worsening due to inactivity and

17    escalating depression. (Tr. 531).    Dr. Russo concluded that Plaintiff's pain, described as

18    moderately severe or worse, is medically reasonable in light of Plaintiff's history and records.

19    (Tr. 531).

20    **C.  Mental Condition**

21    **1. Examining physicians**

22        *a)*    ***Dr. Robert J. Henley***

23        According to a DES-referred psychological evaluation by Robert J. Henley, Ph.D., dated

24    March 30, 2004, Plaintiff walked independently, but with a slow gait and posture which

25    suggested physical discomfort. (Tr. 333).    As in other medical reports, Plaintiff was described

26

27        [6] Lift/carry 20 pounds occasionally and 10 pounds frequently; stand/walk 6 hours in

28    8-hour workday; sit 6 hours in 8-hour day; Climb ramps/stairs, balance, stoop, kneel, crouch, and crawl occasionally; Climb ladder/rope/scaffolds - never.

as having hunched-forward shoulders. (Tr. 333).  Beloit denied current or past alcohol or

substance abuse (Tr. 332).  Testing revealed a Full Scale IQ Score of 69 (Tr. 333), and his

Diagnostic Impression was as follows:

Axis I        Adjustment Disorder with Mixed Anxiety and Depressed Mood
              Reported Academic deficits
Axis II       Borderline Intellectual Functioning
Axis III      Chronic Pain Secondary to Neck Injury

(Tr. 334).

Plaintiff's situational problems at the time were the repossession of his truck, danger of

being evicted from his apartment, and lack of pain medication for lack of funds or insurance.

(Tr. 334).  Dr. Henley opined that Plaintiff "likely ha[d] limited marketable job skills aside

from manual labor."(Tr. 334-35).  He also found "[t]he claimant's depression and chronic

pain syndrome would limit his ability to cope with stress and exhibit reliability." (Tr. 335).

### b)        *Dr. Patricia Crellin*

On April 27, 2004, Beloit was referred to Dr. Patricia Crellin, who reviewed his medical

records.  She reported Plaintiff used to consumed a six-pack of beer weekly, but had not done

so since he sustained a DUI a year earlier. (Tr. 393).  She noted the smell of alcohol on

Plaintiff's breath, but he insisted he had not consumed alcohol, explaining he had not

showered in several days because he falls easily. (Tr. 393).  Her diagnosis was as follows:

Axis I        Rule out Malingering.  Rule out Alcohol Dependence.
Axis II       Learning Disability Not Otherwise Specified.  Rule out Borderline Intellectual
              Functioning.
Axis III      Status-post Cervical Fusion, Neck Pain, Shoulder Pain per Claimant History.
              Status-post Left Knee Surgery.
Axis IV       Financial Difficulties.  Lack of Social Supports.  Subjective Report of Chronic
              Pain.
Axis V        GAF[7] current 80.

(Tr. 406).

---

[7] Global Assessment of Functioning ("GAF") "represents a clinical evaluation of an individual's overall level of functioning."  A score of 80 reflects "transient and expectable reactions to psychosocial stressors (e.g. difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g. temporarily falling behind in schoolwork)." (Dkt. 19, p. 8, note 6 (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) 32 (1994))).

1    Dr. Crellin opined Plaintiff was not depressed and that "[o]ne cannot rule out the

2    possibility that Mr. Beloit is malingering.  There appears to be some secondary gain issues

3    related to him receiving financial support . . ." (Tr. 408). She indicated that a particularly low

4    result in a memory test could be interpreted as an example of his exaggeration of symptoms,

5    and that "[e]ven with significant closed head injuries, people rarely lose learned skills such

6    as Mr. Beloit describes." (Tr. 408).  Overall, however, she found Beloit to be friendly,

7    cheerful, and cooperative. (Tr. 396).

8    She found there was no psychiatric or psychological impairment related to his June 2003

9    industrial injury. (Tr. 409-11), observing the only possible limitation in Plaintiff's return to

10   full-time employment would be his "covert alcohol abuse" and use of narcotic analgesics.

11   (Tr. 410).  However, because he reported he had not used narcotic analgesics for the previous

12   three months and claimed he stopped drinking alcohol altogether, Dr. Crellin found Plaintiff

13   was capable of returning to his past relevant work as a truck driver. (Tr. 410).

14   *c)*    ***Dr. Robert Narvaiz***

15   Per a DES referral, on January 17, 2005 Dr. Robert Narvaiz examined Plaintiff and

16   diagnosed the following:

17   Axis I      Panic Attack Disorder, Major Depression with Psychotic Features.
     Axis II     Rule out Borderline IQ.
18

19   (Tr. 438).

20   Plaintiff's relevant mental abilities were all characterized by Dr. Narvaiz as either

21   "Moderately limited"[8] or "Markedly limited"[9] (Tr. 439-42).  Plaintiff reported that for the last

22   seven months he had abstained from alcohol consumption but could not recall any of his past

23   employment. (Tr. 436).  Dr. Narvaiz opined that Beloit had the ability to manage his own

24

25

26

27   ────────────────────

28        [8] Defined as "fair/limited but not precluded" abilities.

     [9] Ability defined as "Poor or none."

money, but that he "may" have difficulties with job functioning[10] due to his anxiety and depression. (Tr. 438).

**2. Non-examining physicians**

*a)* ***Jane George, Ph.D.***

Jane George, Ph.D., on April 3, 2004 found Plaintiff suffers from an affective/adjustment disorder,[11] mental retardation,[12] and an anxiety-related/adjustment disorder.[13] (Tr. 338-343). She opined that Plaintiff could complete tasks parallel to truck driving, maintain satisfactory concentration, and be productive.

*b)* ***Larry F. Waldman, Ph. D.***

One month later, Consultant Larry F. Waldman, Ph. D. opined that Plaintiff had mental retardation and substance addiction disorders. (Tr. 447). He found Beloit was mildly to moderately restricted in social functioning and maintaining concentration. (Tr. 457). He also opined that Plaintiff was not credible. (Tr. 461).

**D. Testimony/Statements of Plaintiff**

On October 27, 2003, Plaintiff filled out a form for the DES in which he indicated he has a pounding headache all the time, gets dizzy and falls, occasionally loses his sight, has difficulty picking up a cup of coffee, and has massive pain. (Tr. 178-79).

On April 18, 2006, Plaintiff testified at the ALJ hearing that he wears a knee brace all the time on his left knee. (Tr. 518). He was told that because of the left knee surgery, the extra

---

[10] Examples he listed were: carrying out detailed instructions; working extended periods of time; working in proximity to others; working without interruptions; interacting with the public; requesting simple assistance; getting along with coworkers; and tolerating criticism from supervisors. (Tr. 438).

[11] Defined as a "[d]isturbance of mood, accompanied by a full or partial manic or depressive syndrome . . . " (Tr. 341).

[12] Defined as "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period." (Tr. 342).

[13] Defined as reaching a point when the "anxiety [i]s the predominant disturbance or anxiety experienced in the attempt to master symptoms." (Tr. 343).

weight on the right knee would eventually cause right knee pain which he now experiences. (Tr. 517).  His pain is constant and ranges from 5 to 8 with medication.[14] (Tr. 518).  At the time of the hearing, Beloit was using Oxycodone and Ibuprofen 800 for pain. (Tr. 519).

Plaintiff was also taking Alprozalan and Cyclobenzapine, one for anxiety and depression, the other for schizophrenia. (Tr. 519).[15]  He testified he had not undergone any mental health counseling, nor had he been referred for counseling by his doctor.[16]  Beloit does not believe counseling would help him because his depression is due to his physical disabilities. (Tr. 520).

Beloit testified he has been depressed since his injury on June 10, 2003.  He feels he is going crazy because he cannot work or do anything. (Tr. 520-21).  He doesn't want to do anything, is usually irritable, cannot concentrate, and is forgetful. (Tr. 521).  He feels worthless. (Tr. 521).

Plaintiff can stand for 15 minutes after which his legs start to throb and then numbness sets in.  Walking one block causes him to fall down. (Tr. 524).  He lives in a second floor apartment and testified it was "[v]ery, very hard" for him.  At the time of the hearing, he had been waiting 18 months for a first floor apartment to open up for him. (Tr. 524).

Plaintiff testified he can sit for 20 minutes, lift five to six pounds without pain, and seven to eight pounds but not repetitively. (Tr. 524-25).  Due to numbness, grasping and gripping are difficult; he drops things "[a]ll the time." (Tr. 525).

It is very difficult for Plaintiff to stoop, bend, or kneel. (Tr. 526).  His sister helps with housecleaning, a friend takes him shopping, and he "[v]ery rarely" visits others. (Tr. 526).

---

[14] On a scale of 1-10, 10 being the highest level of pain. (Tr. 518).

[15] The records indicate that Dr. Bryant prescribed three of the four medications (Tr. 519-20); nowhere does it show in his treatment notes that he prescribed Cyclobenzapine, nor that he had diagnosed Plaintiff with schizophrenia.

[16] It appears, however, that Dr. Bryant did refer him for a mental health counseling consult at Value Options on October 12, 2004. (Tr. 486).

His sister and brother-in-law drove Beloit and his father in a large-cab Toyota truck to Rocky Point a few weeks before the ALJ hearing, and he explained that it was a very painful endeavor. (Tr. 527, 536).

Beloit testified he sustained a DUI conviction when he was approximately 18 years old and has not consumed alcohol in three to four years. (Tr. 534-35).  He does not use a cane or walker. (Tr. 535).

**E.  Testimony of Vocational Expert**

Vocational expert ("VE") Sandra Richter testified that:

• Plaintiff's prior position as a pipe layer is heavy, semi-skilled work; his prior position as an electrician is medium, skilled work; and his prior position as a truck driver is medium, semi-skilled work.

• If Plaintiff had medium level exertional limitations, coupled with psychological limitations, such as a limited capacity to deal with work stresses, maintain attention and concentration, and demonstrate reliability, there would be no work availability.

(Tr. 538-43).

**F.  Third Party Statement**

Plaintiff's friend, Timothy Scott Lerma, completed a Function Report on August 26, 2004. (Tr. 143-51).  Lerma had known Beloit eight years, and had been assisting his friend by visiting him, taking him on errands, and helping with paperwork and bills.  Plaintiff used to work and enjoyed the outdoors.  Since his injury, he usually stays at home, doesn't like being in public, and is in too much pain to work.  Plaintiff occasionally needs help using the toilet, usually wears the same clothes, and cannot drive.  He is depressed, has poor memory, and is "paranoid of authority." (Tr. 148-49).  Beloit can only walk 20 to 30 minutes before requiring a five to 10 minute break to ease the pain.  Lastly, Plaintiff "breaks down emotionally" under stress, gets anxiety attacks, and uses a cane and knee braces. (Tr. 149).

**G.  ALJ's Findings**

The ALJ concluded that Beloit "has the ability to ambulate effectively and perform fine and gross movements." (Tr. 19).  He found that, with the exception of prescribed medication, Beloit had "not undergone any continuing treatment modality for a chronic pain syndrome,"

and observed he does not use any ambulatory devices, can take public transportation, and lives independently. (Tr. 23).

He found that "claimant's allegations of a complete inability to work are not wholly accepted" based on the complete record. (Tr. 24). He concluded the Plaintiff's RFC includes medium work (although he must avoid overhead reaching and repetitive neck movements), and is thus capable of returning to his past relevant work as a truck driver.[17] (Tr. 23). The ALJ also found that Beloit's mental impairments result in mild restrictions, which do not further limit his ability to perform work-related activities. (Tr. 20, 24).

The ALJ concluded that Plaintiff was not disabled as defined in the Social Security Act and Regulations. (Tr. 24-25).

**IV. ANALYSIS**

Plaintiff argues that the ALJ improperly rejected the opinions of the treating physicians; did not cite the opinion of the testifying medical expert; found Plaintiff's psychological problems were severe but did not evaluate all the relevant evidence; and failed to properly assess Plaintiff's IQ score in evaluating his disability. (Dkt. 14).

When evaluating a claim for a Period of Disability and Disability Insurance Benefits, the claimant has the burden of establishing disability. A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

---

[17] The recommendation of returning to work as a truck driver, given Plaintiff's limited experience fourteen years ago and uncontroverted testimony that he worked only a few months before injuring his neck and never returned to the job, is questionable. Moreover, the initial SSA decision, as well as the subsequent reconsideration, both indicate Plaintiff could not return to his past relevant work but could only do "simple" work that required only light exertion.(Tr. 32-33, 37-38).

The ALJ must engage in a five-step evaluation pursuant to 20 C.F.R. §§ 404.1520 and 416.920 to determine whether the claimant is disabled.  In the first four steps of the analysis the claimant has the burden of demonstrating:

(1) that the claimant has not engaged in substantial gainful activity since filing for benefits;

(2) that the claimant's alleged impairment is sufficiently severe to limit ability to work;

(3) that, if a severe impairment is found, it is included in the Listing of Impairments and meets the duration requirement; and if not,

(4) that, after considering all impairments in combination and determining the claimant's Residual Functional Capacity ("RFC"), the claimant can no longer perform past relevant work.

Finally, if the claimant establishes Step 3 or Step 4,  the burden shifts to the Social Security Administration to demonstrate;

(5) that the claimant is not disabled and can still engage in some type of substantial gainful activity that exists in significant numbers in the national economy.

See 20 C.F.R. § 404.1560(c)(2).

The ALJ found that Plaintiff met Steps 1 and 2. (Tr. 24).  The ALJ found he did not meet Step 3, in that his impairments, while severe, did not meet those on the Listing of Impairments. (Tr. 21).

Proceeding to Step 4, the ALJ found Plaintiff suffered severe impairments medically equal in severity as those on the Listing of Impairments:

1. History of knee disorder (stable)
2. Neck and back disorders
3. Complaints of shoulder pain
4. Borderline intellectual functioning
5. Affective disorder (mild)
6. History of alcohol disorder

(Tr. 24).  Because the ALJ found that Plaintiff was capable of returning to his past relevant work as a truck driver despite these impairments, he did not proceed to Step 5.

**A.  Opinions of Treating Physicians**

"By rule, the Social Security Administration favors the opinion of a treating physician over non-treating physicians."  See Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007) (citing C.F.R. § 404.1527).  The Administration has explained that an ALJ's finding that a treating source medical opinion is not well-supported by medically acceptable evidence or is

1    inconsistent with substantial evidence in the record means only that the opinion is not entitled

2    to controlling weight, not that the opinion should be rejected.  See Orn, 495 F.3d at 632

3    (citing § 404.1527).  Treating source medical opinions are still entitled to deference and, in

4    many cases, will be entitled to the greatest weight and should be adopted, even if it does not

5    meet the test for controlling weight."  Orn, 495 F.3d at 632; see also Murray v. Heckler, 722

6    F.2d 499, 502 (9th Cir. 1983) ("If the ALJ wishes to disregard the opinion of the treating

7    physician, he or she must make findings setting forth specific, legitimate reasons for doing

8    so that are based on substantial evidence in the record.").

9        Plaintiff offers the names of four doctors as treating physicians whose opinions allegedly

10   were not assigned adequate weight by the ALJ. (Dkt. 14, pp. 4-5).  Although the ALJ only

11   referenced Dr. Bryant in his decision, Beloit has had two treating doctors, Drs. Scherer and

12   Bryant.[18]  Dr. Scherer treated Beloit from June 2003 until February 2004, approximately

13   seven months.  Dr. Scherer's treatment was of short duration and began right after the

14   accident.  During that early period, he found Plaintiff could not return to his previous work

15   and that it was too early to discern the severity and duration of his impairments. (Tr. 303-20).

16       Dr. Bryant took over in August of 2004 and the record reflects treatment notes until April

17   2006, approximately 20 months.  The ALJ "accord[ed] no persuasive weight to [his

18   September 2004] statement since Dr. Bryant indicated it was completed based on the

19   claimant's word as to his alleged restrictions." (Tr. 22).  The ALJ found that "the objective

20   findings contained in the records of Dr. Bryant do not support such extreme limitations." (Tr.

21   22).

22       The law in the Ninth Circuit is clear that the ALJ must defer to the treating doctor's

23   opinion, even if controverted by another doctor, unless the ALJ makes findings setting forth

24   specific, legitimate reasons for rejecting it that are based on substantial evidence in the

25   record.  See Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995).  Here, the ALJ did not

26   state that Dr. Bryant's opinion was contradicted, only that the limitations assessed by Dr.

27

28       [18] The other two physicians named by Plaintiff are examining doctors and will be addressed in part IV, section B, *infra*.

1  Bryant were not supported by his treatment notes.  Under these circumstances, Dr. Bryant's

2  opinion was entitled to deference.  Furthermore, the ALJ did not set forth specific, legitimate

3  reasons, supported by substantial evidence in the record, for rejecting the opinions of Dr.

4  Bryant and Dr. Scherer.[19]  To the contrary, the ALJ's reasoning was cursory.

5  **B.  Opinions of Examining Physicians**

6      Plaintiff argues that the ALJ ignored the opinions of Drs. Yeung and LaPrade altogether.

7  (Dkt. 14, p. 5).  However, the ALJ devoted a full paragraph to Dr. Yeung's opinions, and

8  although minimal, he addressed Dr. LaPrade's in a sentence. (Tr. 21).

9      The ALJ focused on Dr. Yeung's observation that Plaintiff's responses were "over

10  exaggerated." (Tr. 293, 21), and that Beloit's pain response was out of proportion to the MRI

11  findings. (Tr. 294, 21).  However, Dr. Yeung had also suggested pain management and

12  concluded that Plaintiff had "severe pain, which precludes him from returning to work at this

13  time," (Tr. 294). Similarly, the ALJ referred to Dr. LaPrade's notation of inconsistency

14  between Plaintiff's symptoms and the radiographic abnormality in his neck but did not refer

15  to the doctor's finding that Beloit "appear[ed] to be fairly disabled from neck pain, back pain,

16  [and] left shoulder pain." (Tr. 321, 21).

17      Additionally, the ALJ relied on Dr. Powers' accounts of functional overlay, absence of

18  discrete cervical radiculopathy, nerve root and spinal cord compressions, and Beloit's

19  stationary condition with respect to the June 2003 industrial injury. (Tr. 22).  The doctor had

20  also noted he was in "a self perpetuating situation where his symptoms are progressively

21  worsening associated with his inactivity and escalating depression." (Tr. 330).

22      Although the ALJ discussed Dr. Araghi's opinion of functional overlay (Tr. 22), he did

23  not mention Dr. Moczynski's evaluation that Plaintiff's condition was not stationary and

24  required continued active care. (Tr. 58-59).

25

26

27

28      [19] Arguably Dr. Scherer's opinions were rejected since the ALJ did not address his opinions or treatment notes in his decision.

**C.  Opinions of the Medical Expert**

The ALJ noted that Plaintiff "essentially could perform some regular work activity" based on the testimony of Dr. Russo, the SSA's medical expert, (Tr. 19).  However, a fair consideration of the record does not support this conclusion.  First, Dr. Russo testified that Beloit could sit for one to two hours at a time, walk/stand for 30 minutes to an hour, but with neck motion restricted, all within a six to eight hour day. (Tr. 530).  Second, in a questionnaire completed before the hearing, Dr. Russo indicated that the problems with Plaintiff's low back and previous knee injury would not interfere with "medium level" work (Tr. 461); however, this does not include symptoms related to his neck fusion.  In fact, Dr. Russo testified that Plaintiff's limitations primarily involved neck movement, stating he "has definite arthritis of the neck." (Tr. 462, 530).

The ALJ did not note that Dr. Russo had affirmed Dr. Yeung's opinion that Plaintiff's severe pain precluded work; Dr. LaPrade's account that Beloit was "fairly disabled" due to pain; Dr. Powers' determination that Plaintiff's condition was worsening due to inactivity and escalating depression; and finally, Dr. Russo's conclusion that Plaintiff's pain, described as moderately severe or worse, was medically reasonable in light of Plaintiff's history and records. (Tr. 531).

Commission regulations state in part "that [r]egardless of its source, we will evaluate every medical opinion we receive.'" Robinson v. Barnhart, 469 F.Supp.2d 793, 798 (D. Ariz. 2007) (citations omitted).  The ALJ excluded Dr. Moczynski's and Dr. Scherer's evaluations in his decision, and "selectively focused on aspects of the medical opinion[s] suggesting non-disability" in those that he did consider. See Robinson, 469 F.Supp.2d at 797.

**D.  Plaintiff's Mental Impairment**

The ALJ "d[id] not accord substantial persuasive weight to the opinions of Dr. Henley." (Tr. 19-20).  He found Dr. Henley's opinions that Beloit's limited ability to deal with work stresses and maintain attention/concentration were inconsistent with his observations that Plaintiff "was alert and oriented times four, and had no attention or concentration deficits." (Tr. 19).  The ALJ also observed that Dr. Henley's opinion that Plaintiff could follow simple

1    instructions was inconsistent with his history of work as a commercial electrician for over

2    six years. (Tr. 19-20).

3        In contrast, the ALJ found Dr. Crellin's opinions persuasive because her report was

4    comprehensive. (Tr. 20).   He relied on her findings that Beloit "did not have any symptoms

5    of depression," that "there was a marked discrepancy between the claimant's reported poor

6    memory and his ability to actually remember things indicating exaggeration or malingering,"

7    that "there was a significant functional overlay or functional embellishment to the claimant's

8    presentation," and that "there appeared to be some secondary gain issues relating to the

9    claimant's Workers' Compensation and personal injury cases." (Tr. 20).

10       The ALJ rejected the opinion of Dr. Narvaiz, noting that, unlike Dr. Crellin, Dr. Narvaiz'

11   psychological evaluation was "cursory." (Tr. 20).   He observed that Dr. Narvaiz' opinions

12   were "based largely on the claimant's reported symptoms and subjective answers to

13   psychological questions," which were suspect in light of Dr. Crellin's opinion that Plaintiff

14   embellishes his responses. (Tr. 20).   This conclusion, however, is misleading.  Dr. Narvaiz

15   had access to and referred to Dr. Crellin's extensive report; thus, his opinions were based on

16   much more than Plaintiff's self-reported symptoms.  Dr. Narvaiz diagnosed Beloit with Panic

17   Attack Disorder and Major Depression with Psychotic Features, which gives additional

18   credence to Dr. Henley's diagnosis of Adjustment Disorder with Mixed Anxiety and

19   Depressed Mood.

20   **F.  Plaintiff's Credibility**

21       "Pain of sufficient severity caused by a medically diagnosed anatomical, physiological,

22   or psychological abnormality may provide the basis for determining that a claimant is

23   disabled." Robinson, 469 F.Supp.2d at 798 (quoting Light v. Soc. Sec. Admin., 119 F.3d 789,

24   792 (9th Cir. 1997) (inner quotations and citations omitted).   "Moreover, once a claimant

25   produces objective medical evidence of an underlying impairment, an ALJ may not reject a

26   claimant's subjective complaints based solely on lack of objective medical evidence to fully

27   corroborate the alleged severity of pain." Robinson, 469 F.Supp.2d at 798 (quoting Moisa

28   v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004) (inner quotations, citations, and alteration

omitted). Furthermore, "unless the ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find the claimant not credible by making specific findings as to credibility and stating clear and convincing reasons for each. <u>Robinson</u>, 469 F.Supp.2d at 798 (quoting <u>Robbins v. Soc. Sec. Admin.</u>, 466 F.3d 880, 883, (9th Cir. 2006) (inner quotations and citation omitted).

The ALJ pointed out the following inconsistencies in Plaintiff's statements and testimony:

• He reported to the SSA that he earned a GED but later testified to the contrary. (Tr. 18).
• He visited Rocky Point a few weeks before the hearing. (Tr. 18).
• He contradicted himself several times regarding his alcohol consumption. (Tr. 23).
• He showed signs of exaggeration upon physical examinations. (Tr. 23).

The ALJ thus concluded that Plaintiff was not "fully credible" with regard to the severity and extent of his limitations. (Tr. 23).

It is undisputed that Plaintiff has several severe impairments. Because the ALJ did not make a finding of malingering, to find Beloit not credible requires specific findings as to credibility and clear and convincing reasons for each. Plaintiff has made some inconsistent statements which arguably impact upon his credibility. However, the ALJ has not met the clear and convincing standard to support an adverse credibility finding. Given the complete record before the Court, Plaintiff's credibility does not support denial of his claim.

**VI. CONCLUSION**

The Court has reviewed the Commissioner's final decision under a substantial evidence standard and finds that the decision denying benefits is not supported by substantial evidence. Specifically, the ALJ made an unsupported credibility determination, gave little weight to the opinions of Plaintiff's treating physicians, and did not adequately assess the entire record as a whole.

Accordingly,

**IT IS ORDERED** that Plaintiff's Motion for Summary Judgment (Dkt. 13) is **granted.**

**IT IS FURTHER ORDERED** that Defendant's Cross Motion for Summary Judgment (Dkt. 17) is **denied**.

**IT IS FURTHER ORDERED** that the case is remanded for an award of benefits.

1
2
3
4       DATED this 18th day of March, 2008.
5
6
7       _____
8                 Earl H. Carroll
          United States District Judge
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28